UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : CASE NO. 1:19MJ50 |
| | : |
| WAQAR UL-HASSAN | : |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, DANIEL A. HARDY, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of a criminal complaint charging WAQAR UL-HASSAN (HASSAN), date of birth February 10, 1984, with violating 18 U.S.C. § 1001. As set forth in greater detail below, there is probable cause to believe HASSAN made materially false statements to the Federal Bureau of Investigation (FBI) regarding his contact with persons associated with designated Foreign Terrorist Organizations (FTOs), as well as false statements to the FBI regarding his efforts to provide material support to FTOs.

2. I am a Detective with the Virginia Tech Police Department ("VTPD") in Blacksburg, Virginia. I am currently assigned to the FBI's Richmond Field Office as a Task Force Officer (TFO) on its Roanoke Resident Agency's (RRA) Joint Terrorism Task Force (JTTF). As a JTTF TFO, I am deputized pursuant to Title 28 as a Special Deputy United States Marshal and charged with the duty of investigating violations of the laws of the United States.

3. I have been a sworn law enforcement officer with the VTPD for fifteen years, and a criminal investigator for twelve of those years. I have been assigned to the RRA JTTF, working international and domestic counterterrorism investigations almost exclusively, for approximately

three years. I have participated in all aspects of FBI counterterrorism investigations, to include but not limited to conducting surveillance, analysis of subpoenaed telephone and email records, subject and witness interviews, operating confidential human sources, and participating in the execution of federal search warrants.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show simply that there is sufficient probable cause to support that HASSAN has committed the criminal conduct alleged.

## CRIMINAL VIOLATIONS

5. Section 1001(a)(2) of Title 18 of the United States Criminal Code states, in pertinent part, that it is unlawful for anyone to knowingly and willingly "make[] any materially false, fictitious, or fraudulent statement or representation" "in any matter within the jurisdiction of the executive . . . branch of the Government of the United States."

6. Section 1001(a) further states that "if the offense involves international . . . terrorism" the person making the materially false statement "shall be fined . . . imprisoned not more than 8 years."

## FACTS SUPPORTING PROBABLE CAUSE

### *The Islamic State of Iraq and al-Sham*

7. On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam 'at al Tawid wa' al-Jahid, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive order 13224. On or about May

2

15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS" – which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State and ISIS. To date, ISIS remains a designated FTO.

8. Beginning in 2014, using social media, ISIS has called for attacks against citizens – civilian and military – of the countries participating in the United States-led coalition against ISIS. For instance, on September 21, 2014, ISIS released a speech of Abu Muhammed Al-Adnani, a former senior leader and official spokesman of ISIS, who is now deceased. In this speech, entitled, "Indeed Your Lord is Ever Watchful," Al-Adnani calls on Muslims who support ISIS from around the world to "defend the Islamic State" and to "rise and defend your state from your place where you may be." More recently, using social media, ISIS has been encouraging individuals to kill specific persons within the United States.

*Jaish-e-Mohammad*

9. On or about December 26, 2001, the United States Secretary of State designated Jaish-e-Mohammed (JeM) as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act. JeM is an Islamic extremist group based in Pakistan that was founded in early 2000 by Masood Azhar, a former senior leader of Harakat ul-Ansar, upon his release from prison in India. The group's aim is to unite Kashmir with Pakistan, and it has openly

3

declared war against the United States. It is politically aligned with the radical political party Jamiat Ulema-i-Islam's Fazlur Rehman faction (JUI-F). Pakistan outlawed JeM in 2002. By 2003, JeM had splintered into Khuddam ul-Islam (KUI), headed by Azhar, and Jamaat ul-Furqan (JUF), led by Abdul Jabbar, who was released from Pakistani custody in August 2004. Pakistan banned KUI and JUF in November 2003.

10. JeM has continued to operate openly in parts of Pakistan despite being banned by the Pakistani government. Since 2000, JeM has conducted many fatal terrorist attacks. JeM claimed responsibility for several suicide car bombings in Kashmir, including an October 2001 suicide attack on the Jammu and Kashmir legislative assembly building in Srinagar that killed more than 30 people. The Indian government has publicly implicated JeM, along with Lashkar e-Tayyiba (LT), for the December 2001 attack on the Indian Parliament that killed nine and injured 18. Pakistani authorities suspect JeM members may have been involved in the 2002 anti-Christian attacks in Islamabad, Murree, and Taxila that killed two Americans. In December 2003, Pakistan implicated elements of JeM in two assassination attempts against President Pervez Musharraf. In July 2004, Pakistani authorities arrested a JeM member wanted in connection with the 2002 abduction and murder of U.S. journalist Daniel Pearl. In 2006, JeM claimed responsibility for a number of attacks, including the killing of several Indian police officials in the Indian-administered Kashmir capital of Srinagar. In 2016, Indian officials blamed JeM for a January 2016 attack on an Indian Air Force base. One civilian and seven Indian security force personnel were killed. From February through May 2016, both LeT and JeM were suspected of engaging in at least three firefights with Indian security forces in Kupwara district, Jammu and Kashmir, injuring approximately two Indian personnel. In June 2017, Indian police stated JeM conducted multiple

attacks against security forces in five locations across the state of Jammu and Kashmir, injuring over a dozen people.

### *Waqar Ul-Hassan*

11. HASSAN was born February 10, 1984 in Uttam Gujrat, Pakistan. He moved with his family to Brooklyn, New York in 1999 at the age of fifteen. HASSAN became a naturalized United States citizen in 2002, but retained citizenship in Pakistan.

12. HASSAN and his family moved to Glade Spring, Virginia in late 2008 or early 2009. For the most part, HASSAN has intermittently lived in the vicinity of Glade Spring, Virginia or Pakistan since that time.

13. The FBI Roanoke Resident Agency ("Roanoke RA") is located in Roanoke, Virginia, which is within the Western District of Virginia. The FBI Roanoke RA and its counterterrorism special agents are charged with international terrorism investigations within, and affecting, the Western District of Virginia. In many cases, these counter-terrorism investigations focus on, among other things, whether an individual has had contact with – or has provided support to – any foreign terrorist organization.

14. On or about July 25, 2014, the FBI Roanoke RA initiated an international terrorism investigation of HASSAN based on information HASSAN was in communication with persons associated with FTOs. At the time the investigation was initiated, HASSAN was living in Pakistan. HASSAN was interviewed by FBI personnel in Islamabad, Pakistan on or about April 13, 2015 and April 15, 2015.

15. HASSAN returned to the United States on or about May 18, 2015, and was subsequently interviewed by the FBI several times, to include interviews on May 20, 2015, July 30, 2015, August 21, 2015, and October 16, 2015. As explained below, in subsequent interviews

with the FBI on November 18, 2015, and November 19, 2015, HASSAN admitted that he had lied to FBI agents in previous interviews.

16. HASSAN departed the United States for Pakistan on March 30, 2016. HASSAN has not returned to the United States since his departure, but has booked travel to return to the United States and is expected to arrive at Charlotte Douglas International Airport in Charlotte, North Carolina on or about April 30, 2019.

17. HASSAN was interviewed by FBI personnel in Islamabad, Pakistan on April 13, 2015 and April 15, 2015 regarding his knowledge of persons who supported or were otherwise associated with FTOs. During the April 15, 2015 interview, HASSAN was advised by interviewing FBI agents that it was a crime to be untruthful in his statements to the FBI.

### *Hassan's False Statements Regarding Association with Terrorist or Extremist Groups (False Statement #1 on May 20, 2015)*

18. HASSAN returned to the United States on May 18, 2015 and resided in and around Glade Spring, Virginia, which is within the Western District of Virginia. On or about May 20, 2015, FBI personnel interviewed HASSAN in Abingdon, Virginia regarding his knowledge of persons who supported or were otherwise associated with FTOs. HASSAN was again advised by interviewing FBI agents that it was a crime to be untruthful in his statements to the FBI.

19. During this interview, and after having been reminded by the interviewing agents that it was a crime to be untruthful in his statements to the FBI, HASSAN said <u>he did not support any terrorist groups or extremists, and did not know anyone who was a member of a terrorist or extremist group</u>.

20. On or about November 18 and 19, 2015, HASSAN was interviewed by FBI personnel in Charlottesville, Virginia. Although he was not in custody, HASSAN was advised of

6

his *Miranda* rights and he signed an acknowledgment that he understood those rights in advance of the interviews. During the interviews, HASSAN acknowledged being untruthful in previous FBI interviews regarding his knowledge of persons associated with FTOs. HASSAN admitted to extensive contacts with a JeM recruiter, who he identified by name. HASSAN admitted to exchanging phone numbers with the recruiter and having several conversations about jihad with him. HASSAN further admitted he traveled to – and stayed with – JeM extremists for two or three days in 2014, traveled in Pakistan in 2013 and 2014 to collect money and food for JeM extremists, and passed out recruiting newspapers for JeM in Pakistan in 2014. HASSAN admitted that he had not been truthful because he knew JeM was a terrorist group.

21. In connection with these interviews, HASSAN signed two written statements on or about November 19, 2015. In the first statement, he acknowledged in pertinent part,

> I met with Mujahiden in 2014, while in Pakistan. I traveled to the Border and stayed with them two or three days. I also spent half a day at their Mosque in Deska. I went there because I was curious about jihad. I wanted to find out how they do jihad. I talked to . . . a representative of the Mujahiden about jihad several times. I gave between $400.00 & $500.00 for the Mujahiden medrasa. This Mujahiden is known as Jaish.

(errors in original).

22. In the second written statement signed by HASSAN on or about November 19, 2015, HASSAN acknowledged in pertinent part,

> Between 2013 and 2014 I traveled . . . around the city of Gujrat and surrounding area collecting money and food for Jaish Mujahiden. I did this two or three times. In 2014, while staying with Jaish Mujahiden they told me about an attack on Indian soldier they conducted the previous year. They showed me a news video of the attack. I also past out a newspaper that Jaish Mujahiden uses to recruit people and collect money. I lied because I was scared of getting in trouble because I participated in collecting money, food and passing out the newspaper for Jaish Mujahadin which is a terrorist group but they also help the poor in Pakistan.

(errors in original).

### *Hassan's Statements About Attempting to Provide Material Support to ISIS (False Statement #2 on October 16, 2015)*

23. As noted above, HASSAN was advised by interviewing FBI agents on or about April 15, 2015 and May 20, 2015 that is was a crime to be untruthful in his statements to the FBI.

24. On or about October 16, 2015, HASSAN was interviewed by agents of the FBI Roanoke RA in Bristol, Tennessee. During the interview, HASSAN stated that <u>he never tried to send money to Syria for ISIS and that he never asked [Individual A] about sending money to ISIS</u>. After further questioning, HASSAN admitted having a conversation with Individual A in which he asked for help about sending $150 to ISIS in Syria, but said he never intended to follow through with sending the money to ISIS. He further stated that he sought this individual's advice on sending the money because he knew that individual was pro-ISIS.

25. On November 18, 2015, HASSAN was interviewed by FBI personnel in Charlottesville, Virginia. As noted above, although he was not in custody, HASSAN was advised of his *Miranda* rights and he signed an acknowledgment that he understood those rights in advance of the interviews. HASSAN again acknowledged having a conversation with Individual A about sending money to ISIS in Syria, but claimed that he was "not serious" and never intended to send money to ISIS in Syria.

26. On November 19, 2015, HASSAN was interviewed again in Charlottesville, Virginia. Again, HASSAN was advised of his *Miranda* rights and he signed an acknowledgment that he understood those rights in advance of the interview. HASSAN admitted he was untruthful in his previous statements to the FBI about sending money to ISIS, and that he was serious about sending money to ISIS. In connection with this interview, Hassan signed a statement acknowledging that "[b]ecause [he] was angry about what was happening to the Muslims around

8

the world, [he] was serious about sending $175.00 to the Jihadists in Syria." HASSAN said he "did not send the money because [he] did not have a way to get the money there."

## CONCLUSION

27. In summary, based upon the above facts, I submit there is probable cause to believe that, on or about May 20, 2015 and October 16, 2015, WAQAR UL-HASSAN, within the Western District of Virginia and elsewhere, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations, to wit, his statements to the Federal Bureau of Investigation:

- That he did not support any terrorist groups or extremists, and did not know anyone who was a member of a terrorist or extremist group.

- That he never tried to send money to Syria for ISIS and that he never asked Individual A about sending money to ISIS.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

*s/Daniel A. Hardy*
Daniel A. Hardy, TFO
Federal Bureau of Investigation

Received by reliable electronic means and sworn and attested to by telephone on this 29th day of April 2019.

_____
JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE

9